UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CLARA WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:10-cv-01700-RLY-DKL |
| | ) | |
| ELI LILLY & COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Clara Walker, is a former employee of defendant, Eli Lilly & Company ("Lilly") and is of African American descent. Plaintiff, who is currently proceeding pro se, filed the present action on December 23, 2010, alleging that she was discriminated or retaliated against by being denied a scheduling planner position, being given less than "exemplary" performance reviews, and denied training, in violation of 42 U.S.C. § 2000e, et seq. ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981"). In May 2011, Lilly discharged Plaintiff for falsification of lab test results (also known as "drylabbing"). Plaintiff thereafter amended her Complaint to include allegations that she was discriminated or retaliated against by being asked to transfer to another group in her department at Lilly, subjected to increased surveillance, and wrongfully terminated.

Lilly's Motion for Summary Judgment relates to Plaintiff's Second Amended Complaint, filed on August 9, 2011. This pleading differs from Plaintiff's First Amended

1

Complaint in one respect: it added the allegation that Plaintiff received a Notice of Right to Sue on her second Charge of Discrimination.

The court, having read and reviewed the supporting and opposing briefs, the designated evidence, and the applicable law, now **GRANTS** Lilly's motion.

## I. Background

### A. Employment History

Plaintiff began her employment at Lilly in 1988 as a service operator, where she was responsible for cleaning labs, taking out the trash, and cleaning windows in common areas. (Deposition of Clara Walker ("Plaintiff Dep.") at 31-32). Later that same year, she was promoted to lab technician, received a raise, and became responsible for running tests on insulin to ensure its quality. (*Id*. at 32-35). Approximately one to two years later, Plaintiff was transferred to another lab, where she received increasing responsibility and a series of promotions and raises, culminating in her promotion to quality control specialist. (*Id*. at 35-41).

In approximately 2004 or 2005, Plaintiff was promoted to associate chemist and began working in Lilly's purchased materials quality control ("PMQC") lab, which is part of a larger department consisting of multiple labs. (*Id*. at 40-41, 45, 327). The PMQC lab tests raw materials that Lilly has purchased for use in its own products to make sure they are of an acceptable quality. (*Id*. at 41-42). As a chemist in the PMQC lab, Plaintiff's responsibilities included running tests on raw materials and taking on special projects. (*Id*. at 45-46). In this position, Plaintiff reported directly to Team Leaders Kimberly Dancheck, and later, as of 2008, Mike Westmoreland, among others.

(*Id*. at 90, 325).  The Team Leaders in turn reported to PMQC lab managers, who (since 2008) were Dancheck, Matt Evans, and Edward DeSimone.  (*Id*. at 325-26).

In April 2008, while working under the supervision of Dancheck, Plaintiff was promoted to chemist in the PMQC lab.  (*Id*. at 43).  Notwithstanding the promotion, Plaintiff remained responsible for running tests on raw materials and special projects.  (*Id*. at 42-43, 46).

### B.     Scheduling Planner Position

While Plaintiff was working in the PMQC lab, Lilly needed someone to fulfill the responsibilities of a departed scheduling planner.  (*See generally* Plaintiff Dep. At 108-114; Deposition of Kimberly Dancheck at 29-32).  The position, which would have been a lateral move for Plaintiff, was given to Lynn Porter, a Caucasian Lilly employee whose pay grade (36) was less than Plaintiff's (50).  (Plaintiff Dep. at 110; Plaintiff's Response to Defendant's Interrogatory No. 2).  Plaintiff, however, served as backup in that position for approximately 18 months to two years while Porter was on intermittent family medical leave.  (Plaintiff Dep. at 113).

### C.     The Alleged "Drylabbing" Incident

One of the tests performed in the PMQC lab is the "melt point" test.  In general terms, the test involves slowly raising a substance's temperature and recording the temperature at which the substance melts.  The person conducting the melt point test must visually observe the test in order to determine the temperature at which the tested substance begins to melt and completely melts.  (*Id*. at 400-04).  In other words, the chemist must "sit there and watch it melt[.]"  (*Id*. at 403).

Plaintiff testified that the temperature of the melt point apparatus rises approximately one degree Celsius per minute. (*Id.*). When testing urea, the melt point is typically between 132 and 135 degrees Celsius. (*Id.* at 402, 404). Plaintiff, among others, was responsible for running the test. (*Id.* at 400-05).

### 1. Plaintiff's Version

The events of April 27, 2011, are in dispute. According to Plaintiff, at approximately 2:00 p.m., Plaintiff retrieved lab notebooks, sat them down near the melt point apparatus, and went into another room to get a box cutter. (Affidavit of Clara Walker ("Plaintiff Aff.") ¶ 4). When she returned, DeSimone was looking through her lab notebooks and jumped. (*Id.*). He placed the notebooks back on the counter, engaged her in a conversation about adding him to the diversity team agenda, and left the room. (*Id.*). Plaintiff thereafter performed a melt point test on urea, recorded the results in the lab notebook, and left the urea samples in the melt point apparatus to cool. (*Id.*). Plaintiff then went into another room to weigh the crushed samples, and returned to the melt point area to perform other tests on the urea. (*Id.*). Plaintiff documented the results of the tests, and asked co-worker, Jason Bruning, to verify the results. (*Id.*). DeSimone, (who apparently came back in the room), then engaged her in a conversation. (*Id.*).

### 2. DeSimone's Version

According to DeSimone, he visited the PMQC lab to check on the status of work on certain laboratory equipment, while waiting for a 3:00 p.m. meeting to begin in the same building. (Deposition of Edward DeSimone ("DeSimone Dep.") at 25-31). While in the lab, DeSimone noticed that the melt point apparatus was running unattended. (*Id.*

4

at 20, 25-31). DeSimone observed the temperature begin to climb from 132 to 135 degrees Celsius. (*Id*.). DeSimone witnessed the urea both begin to melt and later completely melt over the span of approximately three minutes. (*Id*.). DeSimone documented his observations by taking photographs with his cell phone, two of which show the temperature apparatus at approximately 133 and 134 degrees Celsius, respectively. (*Id*. at 20-21, 25-34 & Ex. 6).

After the test was concluded, DeSimone heard Plaintiff approaching. He "snuck around to the back of the lab" and returned through another door. (*Id*. at 21, 25). DeSimone and Plaintiff then had a conversation about the test, and Plaintiff confirmed that she was the one responsible for the melt point test that day and indicated that the machine was working properly. (*Id*.). DeSimone witnessed her pull the tubes out of the melt point apparatus and discard them, indicating to him that she had just finished the test. (DeSimone Dep. at 26, 26). DeSimone then left for his meeting, arriving at approximately 3:10 p.m. (*Id*. at 30). The evidence reflects that at approximately 3:15 p.m., Plaintiff entered results for a melt point test in Lilly's computer system. (Plaintiff Dep. Ex. 17 at 10).

### D.    The Investigation

On that same day, April 27, 2011, DeSimone contacted Human Resources representative, Kathy Draper, to report his concern about the melt point test and to seek guidance on how to handle the situation. (Affidavit of Kathy Draper ("Draper Aff.") ¶ 4). DeSimone advised Draper that he was concerned that the test results had been falsified, particularly since Plaintiff had been accused of falsifying test results in the past. (*Id*. &

5

Ex. A; DeSimone Dep. at 79-80).  Draper advised DeSimone that she would investigate the matter.  (*Id*.).

On April 27 and 28, 2011, Draper conducted an investigation into the situation. (*Id.* ¶ 5).  Draper's investigation began with an initial interview with DeSimone and Jeff Hines, DeSimone's supervisor, to review a diagram of the lab and discuss an investigative plan.  (*Id*.).  Next, Draper, with DeSimone present, interviewed everyone who, to her knowledge, had been in the lab that day, including: (1) Plaintiff, (2) Jeff Hines, DeSimone's supervisor, (3) Plaintiff's co-workers, Bruning and Rich Evers, and (4) team leader Westmoreland.  (*Id*. ¶ 5 & Ex. A).  She also reviewed various documents, including the test results, DeSimone's notes, DeSimone's pictures, and the lab notebook. (*Id*.).

As a result of her investigation, Draper concluded Plaintiff had started the melt point test, walked away during the test (the period during which DeSimone observed the test running), and recorded results that she had not actually observed.  (*Id*. ¶ 7 & Ex. A at 9).  Draper's conclusion was based on DeSimone's direct observation of the melt point test being run unattended, along with Draper's elimination of other plausible explanations for the situation (such as the test being run by someone else or being started inadvertently).  (*Id*. Ex. A at 9).

Falsification of test results is grounds for immediate termination at Lilly, a policy that Plaintiff understood.  (Plaintiff Dep. at 440).  Upon concluding that Plaintiff drylabbed the melt point test by entering results she had not actually observed, Draper recommended that Lilly terminate Plaintiff's employment.  (Draper Aff. Ex. A at 9).  On

6

May 4, 2011, Draper, DeSimone, and Hines informed Plaintiff of her termination. (Draper Dep. at 49; Plaintiff Dep. at 320).

## II.     Summary Judgment Standard

Summary judgment is appropriate when the record shows "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "In evaluating a motion for summary judgment, the district court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 744 (7th Cir. 2007) (citation omitted). The court construes all facts, and draws all reasonable inferences, in favor of the nonmoving party. *Hamm v. Weyauwega Milk Products, Inc.*, 332 F.3d 1058, 1061-62 (7th Cir. 2003) (citation omitted).

The burden is upon the movant to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes demonstrates an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the nonmoving party may not rest upon mere allegations or denials in its pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). This summary judgment standard is not relaxed for *pro se* litigants like Plaintiff. *Arnett v. Webster*, 658 F.3d 742, 760 (7th Cir. 2011) (noting that the plaintiff's "*pro* se status does not alleviate his burden on summary judgment"). In other words, to defeat Lilly's motion, Plaintiff

7

must come forward with evidence that creates genuine dispute over a material fact such that a reasonable jury could return a verdict in her favor. *Anderson*, 477 U.S. at 248.

## III. Discussion

Plaintiff responds to Lilly's motion with respect to two claims: Plaintiff's claim that she was discharged in retaliation for filing the present action, and Plaintiff's claim that she was denied the position of scheduling planner due to her race. Both claims are brought under Title VII and Section 1981. Although pled as separate claims, the analysis under Title VII and Section 1981 are essentially the same for both discrimination and retaliation. *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007) ("[W]e generally have applied the same *prima facie* requirements to discrimination claims brought under Title VII and Section 1981. We see no reason to apply different requirements between the statutes with regard to retaliation claims." (citations omitted)). The court will begin with Plaintiff's retaliatory discharge claim.

### A. Retaliation

Plaintiff proceeds under the direct method of proof, which requires her to show that: (1) she engaged in statutorily protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal connection between the protected activity and the adverse employment action. *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (citing *Burks v. Wisconsin Dep't of Tranp.*, 464 F.3d 744, 758 (7th Cir. 2006)). Plaintiff may establish the third element of her direct case by presenting a convincing mosaic of circumstantial evidence from which a reasonable juror

8

could infer intentional retaliation by the decision-maker. *Id*. at 308 (citing *Rhodes v. Illinois Dep't of Transp*., 359 F.3d 498, 504 (7th Cir. 2004)).

  The statutorily protected activity of which Plaintiff complains is the filing of the present action and her "discrimination complaints about Ed DeSimone." (Pl.'s Resp. at 7). With respect to her complaints of discrimination involving DeSimone, Plaintiff submits that she complained of "discrimination by DeSimone to Supervisor Westmoreland, Manager DeSimone, DeSimone [sic] superiors Director Whitacre and Vice President Levy." (*Id.*). Plaintiff, however, fails to explain the substance of the complaints or provide an approximate date of when the complaints occurred. The court's only source of information regarding her claim is based on the allegations of her Second Amended Complaint. (*See* generally Second Am. Compl. ¶¶ 23-35). As noted above, however, to survive summary judgment, a plaintiff may not rest on the allegations of her complaint; she must support her allegations with evidence in the record. *Anderson*, 477 U.S. at 250. Here, the court is met with another roadblock because, although she cited to her deposition, she did not submit the relevant pages for the court's review. *See Winters*, 498 F.3d at 744 ("In considering a motion for summary judgment, the district court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies."). In this circumstance, Plaintiff's retaliation claim based upon the report of DeSimone's allegedly discriminatory conduct cannot succeed.

  If Plaintiff's retaliation claim is to survive, it must be based on the protected activity of filing a lawsuit. Plaintiff's Complaint, filed on December 23, 2010, is a

9

continuation of *Welch v. Eli Lilly & Company*, 1:06-cv-641-RLY-DML,[1] a case she joined in 2007. A three year time gap between Plaintiff joining the *Welch* case and Plaintiff's termination is far too great to support an inference of retaliation. *Myklebust v. Medical College of Wisconsin*, 97 Fed.Appx. 652, 656 (7th Cir. 2004) (three-year gap between protected activity and adverse action too attenuated to support an inference of retaliation); *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1010 (7th Cir. 2000) (one-year gap too long); *Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir. 1998) (eight-month gap too long), *cert denied*, 528 U.S. 988 (1999). Giving the Plaintiff the benefit of the filing date of the original Complaint in this case – December 23, 2010 – her protected activity preceded her May 4, 2011, termination by almost five months. A five-month gap, without more, is insufficient to support an inference of retaliation. *Harper*, 687 F.3d at 308.

Plaintiff submits that there are four pieces of additional evidence to support such an inference. According to Plaintiff, Draper informed her she was being terminated for making "false statements" during an investigation, but in this lawsuit, Lilly claims Plaintiff was terminated for "drylabbing." Thus, Plaintiff argues, Lilly's changing story is evidence of retaliatory motive. Toward that end, Plaintiff claims she has never been notified that others suspected her of drylabbing in the past.

---

[1] *Welch* was filed in 2006 as a putative class action lawsuit against Lilly, alleging race discrimination in violation of Title VII and Section 1981. Plaintiffs eventually withdrew their motion for class certification, and the court granted them the opportunity to refile their claims individually. In 2010, Plaintiff, along with a number of other plaintiffs, did so, resulting in this lawsuit.

10

Drylabbing is defined as falsifying lab results. (DeSimone Dep. at 19). Thus, there is no material difference between what Draper informed Plaintiff upon her termination (termination for making false statements), and Lilly's current litigation position that Plaintiff was terminated for drylabbing. Moreover, the fact that Plaintiff was never notified of previous accusations about her is irrelevant, because the results of those internal investigations were inconclusive, leading to no disciplinary action against her.

Next, Plaintiff contends the investigation against her was "not proper" because DeSimone requested that Draper investigate the matter, and Draper does not have "chemistry experience and specifically no experience with Melt-Point tests." (Pl.'s Resp. at 9).

At the time of the investigation, Draper had ten years of experience in Lilly's Human Resources Department. (Deposition of Kathy Draper ("Draper Dep.") at 10). According to Draper, although a Human Resources employee's experience in a given field may be considered before he or she agrees to conduct an investigation, that criteria is not based on a written policy or procedure; instead, it is just a factor to consider. (*Id.* at 14). Usually, Draper testified, "the person who receives the inquiry is the person who investigates it." (*Id.*). This testimony, the pages of which were cited by Plaintiff, fails to raise an inference that Draper's investigation of Plaintiff was linked to Plaintiff's participation in the present action.

Plaintiff also complains that she asked Draper to see the lab and the location of the melt point test so she could "demonstrate the events that could not have occurred as

11

DeSimone claimed.  Draper refused." (Pl.'s Resp. at 10).  Plaintiff's citation to page 57 of Draper's testimony does not support that statement.  Draper did testify that she did not go to the lab and actually see the melt point apparatus because she "wasn't investigating the area." (Draper Dep. at 21).  Draper explained that the Human Resources Department "is a centralized group and we do a lot of our investigations over the phone." (*Id*. at 23; *see also id.* ("We interview witnesses, those impacted, those accused.  It's not uncommon for us to use the phone in any of those circumstances.")).  Draper opines that she conducted a fair investigation "[b]ased on [her] experience, the information that [she] had, and the interviews that [she] conducted." (*Id*. at 22).  Thus, the fact that Draper did not personally visit the PMQC lab and visually inspect the melt point apparatus does not raise an inference that Plaintiff's termination was linked to her participation in this lawsuit.

Plaintiff also argues that even if Draper honestly believed that Plaintiff drylabbed the results of the melt point test that day, there is evidence that DeSimone "manipulated" the investigation.  For example, Plaintiff claims that DeSimone refused to look at her lab notebook.  Had he done so, argues Plaintiff, he would have seen that he was mistaken in his belief that she started to test the urea, left the area while the melt point apparatus was heating up, and reported results she did not visually observe.  Plaintiff provides no citation to the record to support these statements.  Moreover, as Lilly points out, whether and when Plaintiff entered the melt point test results in a lab notebook has no bearing on whether the test had actually been completed at the time Plaintiff alleges.

In another challenge to the investigation, Plaintiff posits that DeSimone's presence during the interview process might have created a situation where Plaintiff's co-workers, Bruning and Evers, felt pressured to side with DeSimone. The court has reviewed Draper's investigative report, which is admissible under the business record exception to the hearsay rule, and finds no evidence that DeSimone's presence during Bruning's and Evers' eight-question interviews unduly influenced their one-word/one-sentence answers. (Draper Aff., Ex. A). For example, Bruning stated that he saw nothing unusual in the lab that day. (*Id*. at 7). He saw Plaintiff using the melt point apparatus, and verified the results "kind of late in the afternoon," but did not notice what time the test was run. (*Id*.). Evers also stated he saw nothing unusual in the lab that day. Unlike Bruning, however, Evers said that he saw Plaintiff use the melt point apparatus "at about 3:00 p.m." (*Id*. at 8). Bruning's testimony corroborates DeSimone's report.

Lastly, Plaintiff argues that DeSimone was biased against her. Her sole piece of evidence is her representation that DeSimone told Westmoreland "that he was sick and tired of having to justify his self for this silly lawsuit that he didn't think had merit." (Plaintiff Aff. ¶ 10). Plaintiff's statement suffers from several fatal defects. First, this statement is hearsay within hearsay, and is therefore, inadmissible. FED. R. EVID. 802. Second, the alleged statement is inconsistent with the procedural history of this case. Plaintiff's original lawsuit did not involve DeSimone. It was not until Plaintiff amended her Complaint post-discharge that any conduct involving DeSimone was included in the Complaint. For these reasons, the court must **GRANT** Lilly's Motion for Summary Judgment on Plaintiff's retaliation claim.

13

### B. Failure to Promote

The court interprets Plaintiff's claim that she was unlawfully denied the position of scheduling planner as a failure to promote claim. A prima facie case requires Plaintiff to show that: (1) she is a member of a protected class; (2) she had the requisite qualifications for the promotion; (3) she was denied the promotion; and (4) a member of the nonprotected class who was not better qualified was promoted instead. *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 273 (7th Cir. 2004) (citing *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003)). Plaintiff's prima facie case is doomed at the outset, because the position of scheduling planner was not a promotion; it was a lateral transfer. (*See* Plaintiff Dep. at 110 (testifying that the position was a lateral move for her)). Accordingly, the court must **GRANT** Lilly's Motion for Summary Judgment on Plaintiff's failure to promote claim.

### IV. Conclusion

Plaintiff failed to raise a genuine issue of material fact with respect to the two remaining claims in this case – her claim for retaliation and her claim for failure to promote. Lilly's Motion for Summary Judgment (Docket # 75) is therefore **GRANTED**.

**SO ORDERED** this 20th day of March 2013.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.